foreclosure sale deed which was omitted from the title search could not be imputed to the lender so as to defeat the lender's assertion that it was a bonafide purchaser for value without notice.[25]

### (iii) Earwood's knowledge cannot be imputed to BankPlus because of the Adverse Interest Exception.

Even assuming *arguendo* that Plaintiffs did meet their burden of proving that the Earwood & Childers Firm was BankPlus' agent in connection with the title examinations, which they did not, Plaintiffs' argument still must fail because Earwood's knowledge simply cannot be imputed under the "general rule" of agency law to the Earwood & Childers Firm (and, as such, cannot be imputed from the Earwood & Childers Firm to BankPlus) because of the well established "adverse interest exception" to that general rule.

In *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 (4th Cir. 1995), the Fourth Circuit Court of Appeals noted that the general rule of imputation of knowledge from agent to principal rests upon a legal fiction and a presumption. The *fiction* is that when the agent acts within the scope of the agency relationship, there is an identity of interest between principal and agent. *Id.* The *presumption* is that the agent will perform his duty and communicate to his principal the facts that the agent acquires while acting in the scope of the agency relationship. *Id.* Thus, under the general rule of imputation, the principal is chargeable with the knowledge the agent has acquired, whether the agent communicates it or not, and the knowledge imputed to the principal is considered actual knowledge, not constructive. *Id.*

The Court then proceeded, however, to discuss the adverse interest exception referenced above, first stating that the exception recognizes that *when the interests of the agent and the principal are adverse*, the agent's knowledge *cannot* be imputed to his principal. The exception rests upon one or both of two theories that defeat the presumption underlying the general rule of imputation. First, "when

---

[25] In the Motion to Alter or Amend, Plaintiffs quoted *Mills v. Damson Oil Corp.*, 686 F.2d 1096, 1101 (5th Cir. 1982) for the proposition that "[n]otice or knowledge by an agent who is examining title . . . for a principal, acquired at such time or while he is investigating the title, is notice to . . . such [principal]." (*See* Dkt. No. 101, p. 13). However, this is simply a recognition of the general rule of agency law set forth above and presupposes that the examiner of title was an agent rather than an independent contractor. As such, this statement is not contrary to the holding of *First Properties, LLC*, which holding recognizes that a agency relationship cannot be assumed and must first be established by the party asserting it before the general rule becomes applicable.

the agent is acting outside the scope of the agency relationship, the legal fiction that the agent and the principal share an identity of interest is destroyed." And second, "when the interests of the agent and the principal are adverse, the presumption that an agent will perform his duty and communicate knowledge to his principal no longer exists." Thus, under either theory, knowledge is not imputed from the agent to his principal. *Id.*

Further, in *Union Cent. Life Ins. Co. v. Robinson*, 148 F. 358 (5th Cir. 1906), a binding receipt was issued by an insurance agent which provided that, unless the application for insurance at issue in that case was approved and accepted by the insurance company, the agreement contained in the receipt was void and the amount acknowledged therein was to be returned upon surrender of the receipt. The receipt acknowledged payment of the full premium in cash, but, in fact, the agent had agreed to accept a note for one half of the premium, and he donated the other half, which was his usual commission, to the proposed insured. Under the terms of his agency, the money received by him for the first premium was to be held by him in trust for the insured until the application for the insurance was approved and accepted by the company, until which time he had no interest whatsoever in the premium.

The company defended on the ground that the application for insurance was never approved and accepted and tendered back the premium. The company also contended that the agent was without authority to bind the company by taking a note for one half the premium and donating his commission for the other half. The case was tried in front of a jury, and the only error considered on appeal was that assigned to a portion of the trial judge's general charge to the jury, which was as follows: "I state to you . . . that notice to an agent of any matter connection with the agency is notice to the principal."

The Fifth Circuit Court of Appeals concluded, however, that this charge left the insurer with no defense on the question of waiver. And, while the Fifth Circuit noted that the charge correctly set forth the general rule of imputation of knowledge in an agency relationship, it nevertheless held that, under the facts of the case, notice to the agent was not constructive notice to the insurer due to the adverse interest exception to the general rule:

27

> The reason usually given for the rule announced by the trial judge is that, if the notice is received in the line of the agent's authority, it is his duty to inform his principal, and the law presumes that he performs this duty; and that, ordinarily, on principles of public policy, the knowledge of the agent is imputed to the principal. . . . <u>There is however, an exception to the general rule which is as well established as the rule itself. The rule has no application to a case where the agent is acting for himself, in his own interest, adversely to the interest of his principal.</u> In such case the adverse character of his interest takes the case out of the operation of the general rule, because, first, he will be likely, in such case, to act for himself, rather than for his principal; and, secondly, he will not be likely to communicate to the principal a fact which he is interested in concealing. It would be therefore, both unjust and unreasonable to impute notice by mere construction under such circumstances.

*Id.* (emphasis added).

Other cases from the Fifth Circuit Court of Appeals have held similarly, including at least one case applying Mississippi law. *See e.g. Martin v. Xarin Real Estate, Inc.*, 703 F.2d 883 (5th Cir. (Tex) 1983) ("The rule imputing notice is based upon the theory that it is the duty of the agent to communicate to his principal the knowledge possessed by him relating to the subject matter of the agency, material to the principal's protection and interest, and the presumption that he has performed his duty, . . . and also upon the fiction of the legal identity of principal and agent. This rule does not prevail where the conduct of the agent is such as to raise a clear presumption that he would not communicate the facts to his principal."); *Ohio Miller's Mut. Ins. Co. v. Artesia State Bank*, 39 F.2d 400 (5th Cir. (Miss) 1930) ("Knowledge of an agent is ordinarily notice to his principal. The exceptions to this general rule are twofold. When the interest of the agent is adverse to that of his principal in such a way as that the agent will be presumed to conceal his knowledge from his principal and not to disclose it to him, the rule does not apply. Also, when the knowledge of the agent is not acquired while acting in the course of his employment for his principal, it does not bind the principal. The principal is not chargeable with notice of facts within the knowledge of his agent, when the latter acquired such knowledge while acting as agent for another. The two exceptions are so well settled as not to require citation of authority.").

The Mississippi Supreme Court has also recognized the general rule and the exception thereto. Indeed, in *Scott County Milling Co. v. Powers*, 73 So. 792 (Miss. 1916), the Court concluded:

The rule that notice to an agent is notice to the principal, being based upon the presumption that the agent will transmit his knowledge to his principal, <u>the rule fails when the circumstances are such as to raise a clear presumption that the agent will not perform this duty, and accordingly, where the agent is engaged in a transaction in which he is interested adversely to his principal</u>, or is engaged in a scheme to defraud the latter, <u>the principal will not be charged with knowledge of the agent acquired therein.</u>

*Id.* (emphasis added).

It is clear from the foregoing authority that, even if Plaintiffs had met their burden of proving that the Earwood & Childers Firm was BankPlus' agent in connection with the title examinations and Title Certificates, Earwood's knowledge simply cannot be imputed to the Earwood & Childers Firm (and, as such, cannot be imputed from the Earwood & Childers Firm to BankPlus) for at least three reasons. First, it cannot be seriously questioned that Earwood was acting adversely to the interests of the firm in connection with the title examinations and Title Certificates, and also when he engaged in the fraudulent scheme identified by the Bankruptcy Court. Indeed, as found by the Bankruptcy Court, Earwood essentially duped Childers into signing the Title Certificates on behalf of the firm. (*See* Dkt. No. 94, p. 19). Second, it likewise cannot be seriously questioned that Earwood's conduct raises a clear presumption that he would not communicate to the firm his knowledge regarding Kinwood's adverse interest in the Property. Finally, Earwood was clearly acting outside the scope of his agency vis-a-vis the firm at the time he acquired the knowledge regarding Kinwood's adverse interest in the Property, *which was at the time he executed the initial Kinwood Warranty Deed* (the execution of which had nothing to do with the business of the firm) and *not* at the time he apparently did at least part of the title examination leading to the issuance of the First Title Certificate. *See Mills*, 686 F.2d at 1101 ("[n]otice or knowledge by an agent who is examining title . . . for a principal, *acquired at such time or while he is investigating the title*, is notice to . . .such [principal].") (emphasis added).

> 2. **BankPlus was unquestionably without constructive or inquiry notice of Kinwood's adverse rights.**

BankPlus was unquestionably without constructive notice or knowledge that Kinwood had an interest in the Property which was adverse to Northlake. Indeed, the record establishes that there was

29

nothing recorded in the Land Records or other public records which would provide such notice. Again, the Kinwood Operating Agreement could have been, but was not, recorded in the Land Records or in any other public records. (*See supra*, p. 13). The Kinwood Certificate of Formation on file with the Mississippi Secretary of State could have, but did not, evidence any limitation on the authority of Kinwood's members to convey or encumber Kinwood property.[26] (*See supra*, p. 12). Further, none of the Title Certificates obtained by BankPlus contained anything to put BankPlus on constructive notice that Kinwood had an interest in the Property which was adverse to Northlake; rather, they all certified that title to the Property was vested in Northlake. (*See supra*, pp. 14-18; Trial Tr. Vol. 3, p. 57:5-10).

BankPlus was also without inquiry notice that Kinwood had an interest in the Property which was adverse to Northlake. BankPlus would have been put on inquiry notice if, *and only if*, any of the previously executed and recorded deeds on, and conveyances of, the Property contained a recital "sufficient to put a reasonably prudent man on inquiry as to the sufficiency of the title," thereby charging BankPlus "with notice of all facts which could and would be disclosed by a diligent and careful investigation." See *Harrell*, 925 So. 2d at 876.

Significantly, however, that is not what happened here, and there is no evidence in the record to establish otherwise. Rather, the record establishes that, on its face, the July 12, 2000 Kinwood Warranty Deed conveyed the Property from Kinwood to Northlake for consideration and contained an acknowledgment in the form prescribed by Mississippi law which was duly notarized. (*See supra*, p. 13).[27] The record also establishes that BankPlus obtained multiple Title Certificates from both the Earwood & Childers Firm[28] and from Stewart Title, all of which certified that title to the Property was vested in Northlake and none of which raised any issues related to any of the recitals contained in any of

---

[26] Even had the Kinwood Operating Agreement been recorded with the Mississippi Secretary of State, and even had the Kinwood Certificate of Formation evidenced a limit on Earwood's authority, BankPlus would still lack constructive notice because such records are not reviewed during a typical title examination and BankPlus is not aware of any authority stating that such records provide constructive notice. (*See* Dkt. No. 46, Underwood Expert Report, pp. 10-11).
[27] Again, the fact that the Kinwood Conveyance occurred approximately one month before the initial August 15, 2000 Promissory Note is of no consequence. (*See supra*, footnote 22).
[28] As noted earlier, the fact that a member of Earwood's firm issued these Title Certificates on behalf of that firm is of no moment. (*See supra*, footnote 23).

the prior recorded deeds on or conveyances of the Property. (*See supra*, pp. 14-18; Trial Tr. Vol. 3, p. 60:12-18).

Further, the record establishes: (a) BankPlus' lack of knowledge of the *Kinwood* Operating Agreement, and (b) the fact that the *Northlake* Operating Agreement clearly evidenced Earwood's authority to enter into the Transactions. (*See supra*, pp. 14 and 19).

Finally, Plaintiffs argued in their Motion to Alter or Amend that the Bank admitted during the course of the Bankruptcy Case that it was on inquiry notice that Kinwood had an interest in the Property which was adverse to Northlake. (Dkt. No. 101, pp. 13-14). In support of this argument, Plaintiffs cited to the following Trial testimony of Stanley Simpson, the BankPlus loan officer in connection with the Transactions:

> Q. Assuming that you had known -- assuming that somebody had reported to you, given you a title certificate that said Kinwood . . . owns the property on August 1 of 2000, you would have wanted to inquire into Kinwood . . . since that's not who you thought owned the property, correct?
> A. Yes, sir.
> Q. It would have been important to find out about who owned Kinwood . . . for the same reasons you had inquired about Northlake --
> A. Yes.
> Q. -- for Mr. Earwood. You would have wanted to see the Operating Agreement for the LLC?
> A. Yes.

(Dkt. No. 101, p. 14) (citing to Trial Tr. Vol. 2b, p. 141:7-19).

Significantly, however, Plaintiffs' argument in this regard is completely disingenuous in light of the fact that the questions asked above presented a hypothetical which was not at all consistent with the established facts involved herein. Indeed, BankPlus did not have a Title Certificate stating that *Kinwood* owned the Property on August 1, 2000. Instead, the First Title Certificate stated that title to the Property was vested in *Northlake* as of that date.[29] (*See supra*, p. 14).

---

[29] As noted in footnote 19, *supra*, Childers testified at Trial that the August 1, 2000 date was a typographical error. That date should have been August 7, 2000 (i.e., the date the initial Kinwood Warranty Deed was recorded). (Trial Tr. Vol. 2a, pp. 15-16). Regardless, the First Title Certificate did not state, or even suggest, that Kinwood owned the Property on August 1, 2000. Further, the initial Kinwood Warranty Deed conveying the Property to Northlake was in fact executed on July 12, 2000, twenty (20) days before August 1st.

Based on the foregoing, the Bankruptcy Court should have found BankPlus to be a bonafide purchaser of the Property for value and without notice.

## II. The Bankruptcy Court Erred when it Adjudicated that the Kinwood Warranty Deeds were Null and Void *Ab Initio* and that, as a result, the BankPlus Deeds of Trust did not Create a Valid Security Interest in the Property.

The Bankruptcy Court erred when it held the Kinwood Warranty Deeds to be null and void *ab initio* (in which case the intervening rights of a bonafide purchaser like BankPlus may possibly not be considered) rather than simply voidable (in which case BankPlus' intervening rights must be considered[30], and, as a result of BankPlus' bonafide purchaser status, the BankPlus Deeds of Trust would indeed create a valid security interest in the Property).

As discussed above, the Bankruptcy Court based its holding that the Kinwood Warranty Deeds were null and void *ab initio* on its finding that, because Earwood lacked either express or apparent authority to convey the Property from Kinwood to Northlake (facts not known to BankPlus at the relevant time), Earwood's actions in this regard were in contravention of the Kinwood Operation Agreement and actions in contravention of such LLC operating agreements are "null, void and of no effect" under the *Scarp* decision issued by a New York appellate court. As a direct result, and without considering BankPlus' bonafide purchaser status, the Bankruptcy Court next held that the BankPlus Deeds of Trust did not create a valid security interest in the Property. (Dkt. No. 94, p. 18).

### A. The Bankruptcy Court's reliance on a New York case of first impression was misplaced.

The Bankruptcy Court's reliance on *Scarp* for the proposition that the Kinwood Warranty Deeds were void rather than voidable was misplaced, and such a conclusion of law should be reviewed by this Court *de novo*. *Plunk*, 481 F.3d at 305. *Scarp* involved the following matter of first impression concerning the interpretation of a section of New York's limited liability statute which provided:

> "[w]henever under this chapter members of a limited liability company are required or permitted to take any action by vote, except as provided in the operating agreement, such

---

[30] "[A] voidable deed passes a defeasible title which may be set aside except when it is acquired by an innocent purchaser for value." 26A C.J.S. *Deeds* § 148. See also the cases discussed later in this Brief.

action may be taken without a meeting, without prior notice and without a vote, if . . . consents in writing, setting forth the action so taken shall be signed by the members who hold the voting interests having not less than the minimum number of votes that would be necessary to authorize . . . such action at a meeting at which all of the members entitled to vote therein were present and voted".

812 N.Y.S.2d at 351.

The issue before the New York Court in *Scarp* was solely whether a majority of the members of the LLC involved in that case could take action by written consent. *Id.* The Court reviewed the terms of that LLC's operating agreement and held that a majority of its members could take some actions by written consent but that certain other actions, which were taken in that case, could not be taken absent the approval of all the members. *Id.* Accordingly, according to the *Scarp* Court, the latter actions were null and void as in violation of the LLC's operating agreement. *Id.* at 351, 359-362.

The decision in *Scarp*, which was, again, a matter of first impression in New York, concerned the interpretation of a section of that state's limited liability company statute which is not at issue here (nor is any substantially similar provision of Mississippi's statute at issue). And, perhaps most significantly, *Scarp* did *not* involve the intervening rights of a bonafide purchaser in relation to a conveyance of real property. Accordingly, *Scarp* is completely distinguishable from the instant case, and the Bankruptcy Court's reliance on *Scarp* was misplaced.

B.   **The cases cited below by Plaintiffs are completely distinguishable and/or are contrary to the law in Mississippi.**

Further, the cases Plaintiffs cited below for the proposition that the Kinwood Conveyance was null and void *ab initio* rather than voidable are completely distinguishable in that they all appear to either stand for the proposition that legally *forged* conveyances of real property are void and/or do not involve the intervening rights of a bonafide purchaser in relation to a conveyance of real property like BankPlus is here. Further, some do not involve, and are in fact contrary to, Mississippi law. (*See* Dkt. No. 90, p. 34).

For example, in *Cumberland Capital Corp., Inc. v. Robinette*, 331 So.2d 709 (Ala. Ct. Civ. App. 1976), cited below by the Plaintiffs, the Court held certain real property conveyances to be void rather

33

than voidable under Alabama law (and thus not subject to a bonafide purchasers' intervening rights) because the signatures of the grantors involved in that case "were placed upon the deeds either by forgery or by the grantors having been deceived into signing the instruments in ignorance of their true character." *Id.* at 713, 714. Further, the Court stated that "[e]ven if the signatures are not forged . . . a deed is nonetheless absolutely void where the grantor's signature is obtained by fraud *going to the nature of the instrument he was requested to sign.*" *Id.* at 713 (emphasis added).

While *Cumberland* stands for the proposition that real property conveyances can be absolutely void in Alabama under certain circumstances, those circumstances did not occur in the instant case before this Court. Indeed, Earwood's signature on behalf of Kinwood on the initial Kinwood Warranty Deed was not forged, Earwood was not deceived into signing the initial Kinwood Warranty Deed on behalf of Kinwood in ignorance of that deed's true character, and Earwood's signature on behalf of Kinwood on the initial Kinwood Warranty Deed was not obtained by fraud going to the nature of the instrument he was requested to sign. In short, *Cumberland* is completely distinguishable from the instant case and the holding in *Cumberland* does not support the finding, made in the instant case, that the Kinwood Warranty Deed was null and void *ab initio* rather than voidable. In addition, and as noted below, the holding of *Cumberland* is contrary to Mississippi law.

The case of *Horvath v. Nat'l Mortgage Co.*, 213 N.W. 202 (Mich. 1927), also cited below by the Plaintiffs, is similarly distinguishable. Indeed, the holding in *Horvath* simply stands for the proposition that, under Michigan law, the procurement of a real property grantor's genuine signature by the fraudulent "manipulation of papers" (or some similar deceitful trick) by another constitutes a legal forgery and renders the resulting conveyance absolutely void and not subject to the rights of an intervening bonafide purchaser. *Id.* at 359-60. Significantly, it cannot reasonably be argued that what happened in the instant case is even remotely similar to the actions which led to the holding of *Horvath*, which holding clearly does not apply here. In addition, and as noted below, the holding of Horvath is also contrary to Mississippi law.

Similarly, the case of *Travis v. Dantzler*, 141 So.2d 556 (Miss. 1962), also cited below by the Plaintiffs, simply stands for the proposition that, pursuant to the terms of a Mississippi statute, a conveyance of homestead property is void rather than voidable when such conveyance is not signed by the wife of the owner of the property. *Id.* at 557. Indeed, the holding in *Travis* has nothing at all to do with whether the Kinwood Conveyance should have been held void, as opposed to voidable, and not subject to BankPlus' intervening rights as a bonafide purchaser for value without notice.

      **C.**    **The more persuasive, and analogous, authorities demonstrate that the Kinwood Warranty Deeds were voidable rather than void, and, as such, that the BankPlus Deeds of Trust created a valid security interest in the Property due to BankPlus' bonafide purchaser status.**

In stark contrast to the cases Plaintiffs cited below, there are a number of cases which support the conclusion that the Kinwood Conveyance was not void but voidable, and, as such, subject to BankPlus' intervening rights as a bonafide purchaser. For example, in *Parker v. King*, 108 So. 2d 224 (Miss. 1959), the Mississippi Supreme Court held that a conveyance of real property, though obtained as a result of misrepresentation or fraud, should not be set aside in a situation where the grantee had subsequently conveyed title to a bonafide purchaser for value without notice. *Accord Sanders v. Sorrell*, 3 So. 661 (Miss. 1888) (where an administrator of an estate purchased certain real property at his own sale without the requisite authority to do so, the related conveyance was not void but rather "voidable at most" and subject to the "universal" rule that a *bona fide* purchaser is protected by his own good faith); *see also Jordan v. McNeil*, 1881 WL 863 (Kan. 1881) (finding that a deed made obtained in fraud of the grantor's rights "is not a nullity, but [rather] is effectual to pass the estate, and that it remains valid until defeated by the grantor, . . . so that a conveyance from a fraudulent grantee to a third person without notice, for a valuable consideration, will vest an indefeasible title in such second purchaser. This has been the received doctrine from the earliest times").

Similarly, in *Guice v. Burrage*, 156 F.2d 304 (5th Cir. (Miss.) 1946), the Fifth Circuit held that, under Mississippi law, the mineral deeds at issue in that case were not forgeries. Indeed, when a genuine execution of a mineral deed is obtained by a lessee based on his false representation that the

35

instrument being executed is a *copy* of a mineral lease, the deed is a *voidable*, fraudulent conveyance, and *not* a *void forged* conveyance. *Id.* at 306; *cf. Cumberland* and *Horvath*, discussed above, which were decided under Alabama and Michigan law, respectively. As such, the Fifth Circuit recognized that the conveyance is subject to the intervening rights of a bonafide purchaser and, indeed, held that those rights must be given full effect. *See id.* ("As bona fide purchasers for value, legal title has vested in defendants").

And in *Lee v. Boyd*, 16 So.2d 30 (Miss. 1943), a case cited by the Fifth Circuit in *Guice*, the Mississippi Supreme Court held that, even if a conveyance of real property is procured by fraud, the subject warranty deed will not be cancelled if there is an intervening bonafide purchaser for value without notice of the fraud. *Id.* at 30. In so holding, the Court found in part:

> The evidence was insufficient to affect Coates with such fraud at the time he purchased from Lee. The bill does not charge that Coates either participated in the fraud or had notice of it at the time of his purchase, and the evidence shows without substantial conflict to the contrary. <u>The relief of cancellation will not be granted against a bona fide purchaser for value and without notice for the fraud or other ground for cancellation. This rule applies irrespective of the grounds on which the rescission or cancellation is sought. From a purchaser for value without notice, a court of equity takes nothing away which the purchaser has honestly acquired.</u>

*Id.* (internal citations omitted) (emphasis added).

Further, the case of *Garris v. Smith's G & G, LLC*, 941 So. 2d 228 (Miss. App. 2006) involved a situation where a party was induced to purchase commercial real estate by certain fraudulent misrepresentations by the seller. *Id.* at 230. The Mississippi Court of Appeals first recognized that "a contract procured by fraud is voidable"[31] and acknowledged that the purchaser in such an instance could ordinarily choose to either rescind the contract or bring an action for damages. *Id.* at 232. However, the Court then stated that "when rescission is impossible *such as in this situation where there exists an intervening lienholder* that prohibits a rescission of a contract, 'the Court is powerless to do anything

---

[31] *Accord Svanidze v. Kirkendall*, 169 P. 3d 262 (Colo. Ct. App. 2007) ("It is . . . clear that fraudulent acts generally render a deed voidable, but not void" and "[i]f a deed is voidable for fraud, it will convey good title to a bona fide purchaser.").

36

except to accept the situation created by the fraud and award monetary damages upon the tort committed thereby.'" *Id.* at 232.

It has also been held that a conveyance of real property by a corporation which is *ultra vires* (i.e., not positively forbidden, but impliedly forbidden because not expressly or impliedly authorized) is not void, but rather voidable such that it passes title. *See e.g. Blue River Co. v. Summit County Dev. Corp.*, 207 F. Supp. 283, 290 (D. Colo. 1062); *Harrison v. City of New Bern*, 137 S.E. 582, 584 (N.C. 1927) ("'Where a municipal corporation, having power . . . to acquire and hold real estate for some purposes, takes a conveyance of property for an unauthorized purpose. . . the deed is not void"); *Hall v. Farmers' & Merchants' Bank*, 46 S.W. 1000, 1002 (Mo. 1898) ("Where a corporation is incompetent by its charter to take a title to real estate [and thus, the action is *ultra vires*], a conveyance to it is not void, but only voidable. . . ."); *see also Boston & M. Consol. C. & S. Mining co. v. Montana Ore Purchasing Co.*, 89 F. 529, 530 (D. Mont. 1898) (" The deed. . . by the [corporation]. . . conveyed. . . the legal title to the premises. . . notwithstanding the fact that such deed was not executed with the consent of the holders of two-thirds of the shares of the capital stock. . . . The deed is not void, but only voidable, and the defendant, who is a stranger to the original title of the corporation grantor, is not in a position to take advantage of the fact that it was not executed in the manner provided by [Montana statute]."). While these cases did not involve bonafide purchasers, the principals announced therein should apply here as well, particularly in light of the fact that the Bankruptcy Court essentially found the Kinwood Conveyance to be *ultra vires*.

As set forth above, the cases cited by Plaintiffs below specifically involve legally forged conveyance documents and/or do not involve the intervening rights of bonafide purchasers and/or apply law that is contrary to the law in Mississippi. In contrast, the cases cited herein by BankPlus in support of its positions, while also not *precisely* on point, are clearly more analogous to the facts involved in the instant case and, while some of BankPlus' cases specifically deal with fraudulently induced conveyances of real property, those same cases set forth broad legal principles which properly take into

37

account the property rights of bonafide purchasers like BankPlus. *See e.g.* Garris, 941 So. 2d at 232 (in Mississippi, "a contract procured by fraud is voidable" not void); *Lee v. Boyd*, 16 So.2d at 30 ("The relief of cancellation [of a real property conveyance] will not be granted against a bona fide purchaser . . . [t]his rule applies irrespective of the grounds on which [] rescission or cancellation is sought.")

In addition, the case of *Wells Fargo v. Billingsly*, Civil Action No. S85-0594(NG), while somewhat factually distinguishable, is instructive.[32] In that case, the Court held that when stolen or embezzled funds are wrongfully used to purchase realty in the name of the wrongdoer a constructive trust in that purchased realty comes into being for the benefit of the owner of the funds *except* when there is an intervening bona fide purchaser for value. *Id.* at p. 5. What occurred in the instant case is certainly more analogous to the *Wells Fargo* case than to any of the cases cited below by Plaintiffs. Indeed, the Bankruptcy Court expressly found in the instant case that "Earwood converted [which is essentially the same thing as embezzled] the Property itself by executing and filing the Kinwood Warranty Deed and pledging the Property to BankPlus." (*See* Dkt. No. 94, p. 15). As such, Kinwood would have been entitled to get that Property back *but for* BankPlus' status as an intervening bona fide purchaser of the Property for value and without notice.

### D. Sound public policy favors a finding by this Court that the BankPlus Deeds of Trust are valid and enforceable.

It would comport with sound public policy for this Court to find that BankPlus holds a valid security interest in the Property as a result of its bonafide purchaser status. Indeed, if the Bankruptcy Court's holding to the contrary, which was premised on its holding that the Kinwood Conveyance was void *ab initio* due to Earwood's lack of authority under the Kinwood Operating Agreement, is upheld, it will very likely lead to higher costs of credit for commercial borrowers and/or to a tightening in the commercial credit market.

For example, in an to attempt to insulate themselves from the additional risk the Bankruptcy Court's holding will certainly inject into the commercial lending industry, Mississippi commercial

---

[32] This is an unpublished opinion from this Court, a copy of which is attached hereto as Exhibit "A".

lenders making loans secured by real property could require, as a prerequisite for loan approval, a title examination which "looks behind" each and every one of the prior recorded conveyances in the chain of title involving businesses to determine, through the review of each applicable unrecorded operating agreement (and the like), whether or not each of those prior conveyances was properly authorized by the grantor at the time they were executed. However, such an approach would be entirely untenable and unworkable because it assumes that the lenders (or their title examiners) could obtain the required operating agreements (or, for corporations, the required corporate resolutions) and disregards the fact that it is common for commercial real estate to pass hands between businesses numerous times over relatively short periods. And even if such an approach were feasible, it would, at best, involve significant additional costs which would be passed on to the borrowers in the form of higher interest rates and/or fees, or, at worst, be completely cost prohibitive and time consuming. It is also worth noting in this regard that such an approach is completely contrary to that which has fueled real estate lending for decades -- i.e., the lender's ability to rely on the information contained in and on the face of the land records when making such loans, particularly pertaining to the apparent authority of the parties which executed the prior conveyances in the chain of title on behalf of, for example, LLCs and corporations.

Alternatively, Mississippi commercial lenders could continue to require traditional title examinations and simply raise interest rates and/or fees on their commercial loans in order to attempt to account for the additional risk. Or, such lenders could begin obtaining title insurance in connection with all of their commercial loans and then pass on those associated costs to their borrowers *if* title insurance companies were even willing to insure against that risk. But even if title insurance companies would be willing to insure lenders under these circumstances, they would likely have to raise premiums to account for the additional risk themselves, which means more costs passed on to the borrowers. Finally, Mississippi commercial lenders could simply decide to stop making as many commercial loans secured

by real property, particularly to less credit worthy borrowers, especially if title insurance was unavailable or cost prohibitive.

Finally, overturning the Bankruptcy Court's holdings in this case would be equitable pursuant to the general principle of law that, "wherever one of two innocent persons must suffer loss on account of the wrongful acts of a third, he who has enabled the third person to occasion the loss must be the person who shall suffer." *Securities Inv. Co. v. Cohen*, 131 So.2d 439, 443-44 (Miss. 1961). In this case, the Bankruptcy Court clearly found both Kiniyalocts and BankPlus to be innocent parties. However, Kiniyalocts was in a much better position to discover Earwood's fraud, and, as a result, to limit BankPlus' loss (under the Bankruptcy Court's decision) in connection with the Indebtedness, by reviewing and monitoring Kinwood's business affairs pursuant to, for example, Miss. Code Ann. § 79-29-308.[33] Indeed, as the majority interest holder, Kiniyalocts should have been more diligent in this regard, and George Kiniyalocts, as the general partner of the family limited partnership, probably also had a fiduciary duty to inquire and monitor this investment much more diligently than he did.[34]

Based on the above, BankPlus urges this Court to find that the Bankruptcy Court erred when it held the Kinwood Warranty Deeds to be null and void *ab initio* rather than voidable and subject to BankPlus' intervening rights as a bonafide purchaser for value without notice. Accordingly, the Bankruptcy Court erred when it held that the BankPlus Deeds of Trust did not create a valid security interest in the Property.

### III. The Bankruptcy Court Erred when it Failed to Impose an Equitable Lien on the Property in Favor of BankPlus for the Indebtedness Owed by Northlake to BankPlus under the Promissory Notes and BankPlus Deeds of Trust.

Should this Court decide that the Bankruptcy Court did not err when it held the Kinwood Warranty Deeds to be null and void *ab initio* rather than voidable, this Court should, in the alternative,

---

[33] This provision provides LLC members with the ability to "obtain from the [LLC] from time to time . . .: (1) true and full information regarding the state of the business and financial condition of the limited liability company; (ii) promptly after becoming available, a copy of the limited liability company's federal, state, and local income tax returns for each year, and (iii) other information . . . required by this section."

[34] Kiniyalocts apparently failed to discover the Kinwood Conveyance for over six (6) years. (*See* Dkt No. 46, Underwood Expert Report, p. 11).

find that the Bankruptcy Court erred when it failed to impose a constructive trust and/or equitable lien on the Property in favor of BankPlus for the Indebtedness Owed to it by Northlake.

Equitable liens are "usually defined as a right not recognized by law to have a fund or specific property, or its proceeds, applied to the payment of a debt or an obligation." 1 *The Law of Debtors and Creditors* § 9:13 (June 2008). The Fifth Circuit Court of Appeals appears to have adopted this definition in *Kane Enterprises v. MacGregor*, 322 F. 3d 371, 375 (5th Cir. 1993), wherein it stated that equitable liens are "a right . . . to have a demand satisfied from a . . . *specific* property."

Four factors must generally be satisfied in order to establish an entitled to an equitable lien: (i) the creditor seeking imposition of the lien has no adequate remedy at law; (ii) a valid debt is due that creditor; (iii) identifiable property exists upon which the debt may be charged; and (iv) an intent is shown that the property was to serve as security for the payment of the debt. 1 *The Law of Debtors and Creditors* § 9:13 (June 2008) (citing cases). Further, equitable liens may exist not only through an express agreement but also "out of recognition of general principles of right and justice." *Levy v. McGill*, 2006 WL 2844566 *2 (S.D. Miss. 2006).

In the instant case, BankPlus is entitled, in the alternative, to the imposition of an equitable lien on the Property in the amount of the Indebtedness owed by Northlake because the foregoing four factors are satisfied. First, in the event this Court upholds the Bankruptcy Court's holding that the Kinwood Warranty Deeds were void *ab initio* and, as such, the BankPlus Deeds of Trust are not enforceable, BankPlus would clearly have no adequate remedy at law in connection with recouping the Indebtedness. Second, it is undisputed that the Indebtedness evidenced by the Promissory Notes is a valid debt due to BankPlus. Third, identifiable property, in the form of the subject Property, exists upon which the Indebtedness may be charged. And fourth, in light of the BankPlus Deeds of Trust, it cannot reasonably be disputed that the Property was intended to secure the repayment of the Indebtedness.

Imposing an equitable lien in BankPlus' favor in the amount of the Indebtedness would also be just for the reasons discussed above in connection with why it would be equitable for this Court to

overturn the Bankruptcy Court's holdings in this case. (*Supra*, p. 40). Further, if this Court finds that the adverse interest exception, discussed above in connection with whether Earwood's knowledge can be imputed to BankPlus, does not apply, then the imposition of an equitable lien would be just given that Earwood's knowledge of his fraudulent conduct must also then be imputed to Kinwood.

In the further alternative, this Court should find that the Bankruptcy Court erred when it failed to impose an equitable lien on the Property in favor of BankPlus in the amount BankPlus paid in or around August of 2007 in connection with redeeming a 2005 tax sale of the Property in connection with unpaid 2004 property taxes, *see* Bankruptcy Case Dkt. No. 98, and in the amounts BankPlus paid in connection with the 2002 and 2003 Property taxes ($24,771.85 and $28,945.98, respectively).

The Mississippi Supreme Court has granted an equitable lien in favor of a lender mortgagee that advanced monies for the benefit of a mortgagor after a deed, upon which the lender's deed of trust was based, was held void for lack of delivery. *Associates Fin'l Servs. Co. v. Bennett*, 611 So. 2d 973, 975-977 (Miss. 1992). Courts in other jurisdictions have also imposed equitable liens in favor of mortgagees in situations where deeds or deeds of trust were held to be void, at least to the extent of the amounts the mortgagees had paid for property taxes, insurance, and the like, and of the amounts used to improve, repair or benefit the subject property in some fashion. *See United States v. Francis*, 623 F. Supp. 535, 536-38 (D.C. V.I. 1985); *Keville v. McKever*, 675 N.E. 2d 417, 431-32 & n. 26 (Mass. App. 1997).

Plaintiffs will likely argue that BankPlus is not entitled to the imposition of an equitable lien in any amount based on an argument that this issue was not raised in the Bankruptcy Case. However, in the Fifth Circuit, appellate courts have discretion to consider an issue raised for the first time on appeal if that issue "presents a pure question of law or [is] an issue which, if ignored, would result in a miscarriage of justice." *U.S. for use of Wallace v. Flintco, Inc.*, 143 F.3d 955, 971 (5th Cir. 1998). In light of that standard, this Court clearly has the discretion to consider the instant issue for two reasons. First, this issue involves a pure question of law. Second, for the reasons discussed above in connection with why it would be equitable for this Court to overturn the Bankruptcy Court's holdings in this case,

and for the reasons discussed above in connection with why overturning those holdings would comport with sound public policy[35], ignoring this issue would result in a miscarriage of justice.

## CONCLUSION

For the foregoing reasons, BankPlus respectfully requests this Court to find that the Bankruptcy Court erred when it adjudicated that the Kinwood Warranty Deeds were null and void *ab initio* rather than voidable and when it adjudicated that, as a result, the BankPlus Deeds of Trust were also were null and void *ab initio* and did not create a valid security interest in the Property in favor of BankPlus. BankPlus also respectfully requests this Court to find that the Bankruptcy Court erred when it failed to adjudicate that BankPlus was a bonafide purchaser of the Property for value without notice. Alternatively, BankPlus requests this Court to find that the Bankruptcy Court erred when it failed to impose an equitable lien on the Property in favor of BankPlus for all amounts owed by Northlake to BankPlus under the Promissory Notes, or, in the further alternative, when it failed to impose such an equitable lien on the Property in favor of BankPlus in the amounts BankPlus paid in connection with the taxes on the Property as discussed above.

**THIS** the 5th day of September, 2008.

Respectfully submitted,

**BANKPLUS**

By: /s/ William H. Leech
William H. Leech (MBN 1175)
Danny E. Ruhl (MBN 101576)
Its Attorneys

---

[35] *See In re Mintz*, 434 F. 3d 222 (3rd Cir. 2006). *Mintz* discusses the fact that appellate courts in the Third Circuit will consider issues raised for the first time on appeal if those issues are of "public importance". While the Fifth Circuit does not appear to have expressly adopted such a rule, the "public importance" of reversing the Bankruptcy Court's decision in the instant case can certainly factor in to the "miscarriage of justice" analysis.

43

OF COUNSEL:
**COPELAND, COOK, TAYLOR & BUSH, P.A.**
600 Concourse Building, Suite 100
1076 Highland Colony Parkway (Zip—39157)
P.O. Box 6020
Ridgeland, MS 39158
Telephone: (601) 856-7200
Facsimile: (601) 856-7626
bleech@cctb.com
druhl@cctb.com


Edward E. Lawler, Jr., MBN 1095
R. Keith Foreman, MBN 5421
**McKAY SIMPSON LAWLER FRANKLIN & FOREMAN, PLLC**
368 Highland Colony Parkway (Zip – 39157)
P. O. Box 2488
Ridgeland, MS 39158
Telephone:     (601) 572-8778
Facsimile:      (601) 572-8440
elawler@mckaysimpson.com
kforeman@mckaysimpson.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the above and foregoing on the following via the Court's ECF Notification System:

| | |
|---|---|
| James R. Mozingo, Esq.<br>Knight & Mozingo, PLLC<br>601 Renaissance Way, Suite B<br>P.O. Box 4587<br>Jackson, MS 39296<br>Attorney for Appellees | Christopher Steiskal, Esq.<br>100 West Capitol Street, Suite 706<br>Jackson, MS 39269<br>Office of the U.S. Trustee |
| Derek A. Henderson, Esq.<br>111 East Capitol Street, Suite 455<br>Jackson, MS 39201<br>Chapter 7 Trustee for Northlake Development, LLC | Luke Dove, Esq.<br>4266 I-55 N., Suite 108<br>Jackson, MS 39211<br>Attorney for Northlake Development, LLC |

**THIS** the 5th day of September, 2008.

/s/ William H. Leech
Of Counsel

44